UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Oretha Beh *et al.*,

                                    Plaintiffs,

                    v.

Community Care Companions Inc. *et al.*,

                                    Defendants.

**Report and Recommendation**

19-CV-1417 (JLS)

## I.    INTRODUCTION

Plaintiffs Oretha Beh, Ruby Cason, Briana Kincannon, and Kimberly Balkum are home care workers.  Since 2013, plaintiffs have worked for Community Care Companions, Inc. ("CCC") or Interim Healthcare of Rochester, Inc. ("Interim"), two companies in the home care business.  From their time with CCC or Interim, plaintiffs believe that the companies shortchanged them on compensable time spent maintaining clean uniforms, traveling to client homes, and performing other tasks that would have required overtime pay.  Plaintiffs believe further that the companies have violated state labor laws governing contractual wages, wage notices, and split shifts, among other issues.  Consequently, plaintiffs filed a complaint and then an amended complaint alleging various violations of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201–219; and the New York Labor Law.  Plaintiffs hope to pursue a collective action under 29 U.S.C. § 216(b) and a class action under Rule 23 of the Federal Rules of Civil Procedure.

Interim and its owner, James Watson, have not appeared in the case as of this writing.  CCC; its owner, Alexander Caro ("Caro"); and its Chief Executive Officer, Mark Gatien ("Gatien"), have appeared and have filed a motion to dismiss under Rule 12(b)(6).  (Dkt. No. 114.)  The arguments for dismissal will be addressed in more detail below; in short, the CCC Defendants argue that

maintenance of uniforms is not compensable; that plaintiffs cannot allege unpaid overtime hours without including non-compensable time for maintaining uniforms; and that plaintiffs have not pled enough operational control by Caro and Gatien to warrant individual liability.  Without any FLSA claims, according to the CCC Defendants, the Court should decline to exercise supplemental jurisdiction over any state claims.

District Judge John L. Sinatra, Jr. has referred this case to this Court under 28 U.S.C. § 636(b).  (Dkt. No. 128.)  The Court did not hold a formal oral argument, but at a status conference on April 8, 2020, the parties discussed the case briefly and agreed to submit the motion on papers. (Dkt. No. 138.)  For the reasons below, the Court respectfully recommends denying the CCC Defendants' motion.

## II.   BACKGROUND

This case concerns allegations[1] that defendants hired plaintiffs for their home care businesses but fell short of full pay for all hours worked and full documentation of wages and deductions.  Each named plaintiff had one of two health-related titles as defined under New York state law: Personal Care Assistant ("PCA") or Home Health Aide ("HHA").  Plaintiffs have provided a brief summary of the overlapping duties associated with each title:

> Each Named Plaintiff, whether as an employee of CCC Defendants or of Interim Defendants, is providing and/or provided care to Defendants' clients at the clients' respective residences.  Individuals designated as PCAs perform and/or performed duties including without limitation cleaning and bathing clients, doing their laundry and preparing clients' meals, among other duties.  Duties performed by individuals designated as HHAs include ensuring clients take their medications properly and assisting them in the taking of their medications, helping clients get out of and into bed, assisting in preparation of clients' meals, helping them to eat, maintaining their hygiene, taking clients to medical or other appointments, and related tasks.  PCAs and HHAs perform a mixture of the duties associated with the

---

[1] For the sake of brevity and consistent with Rule 12, the Court will avoid repeated use of the terms "alleged" or "allegedly" in this Background section.  Nothing in this section constitutes a finding of fact unless otherwise noted.

> other title and, in practice, there is no meaningful distinction that is relevant here.
> Each PCA or HHA, including each Named Plaintiff, devotes more than 80% of
> his/her time with each client and in each workweek to the provision of care.

(Dkt. No. 111 at 7–8.)  According to the amended complaint, the current operative pleading, some

plaintiffs began working for Interim as early as January 2013; all of the plaintiffs became employees

of CCC by October 2017, when CCC bought certain home care businesses from Interim.

The issues that plaintiffs have raised in the amended complaint concern how defendants

managed two types of work: "on-the-clock" work and "off-the-clock" work.  Plaintiffs describe their

on-the-clock work as a little bit like traditionally understood shift work: On a regular basis,

defendants assign plaintiffs to specific tasks that have to be performed at specific clients' homes, and

plaintiffs have to perform those tasks within a specified frame of hours.  (*See id.* at 8.)  Defendants

pay plaintiffs on an hourly basis for on-the-clock work, and that "hourly rate of pay constitutes

and/or constituted the worker's regular rate of pay for purposes of the FLSA and the NYLL."  (*Id.*)

In contrast, plaintiffs describe their off-the-clock as follows:

> "Off-the-clock" work performed by Named Plaintiffs, whether employed by
> CCC Defendants and/or by Interim Defendants, includes and included: (a) travel
> between the respective residences of CCC clients or of Interim clients whom a
> Named Plaintiff is or was assigned and scheduled to care for in a single workday; (b)
> time waiting at the residence of the second (or third) client in the same workday for
> the Named Plaintiffs scheduled shift at that residence to begin; (c) washing and
> drying scrubs that CCC Defendants or Interim Defendants require or required
> Named Plaintiffs to wear while caring for clients and to launder; (d) participation in
> mandatory training activities; and (e) provision of home care services to a client at
> his/her residence after completion of a scheduled shift caring for that client.  Such
> "off-the-clock" activities are and were compensable under the FLSA and the NYLL,
> and the time expended on the performance of such activities is and was part of
> Named Plaintiffs' respective workweeks for purposes of the FLSA and the NYLL.
> CCC Defendants and Interim Defendants require and/or required home care
> workers to perform such work, and it is and was performed primarily for the benefit
> of the respective employers requiring its performance.  CCC Defendants and Interim
> Defendants know and have reason to know and/or knew and had reason to know of
> the performance of such work for their benefit.  However, neither CCC Defendants
> nor Interim Defendants compensate or compensated their respective home care
> workers for such work.

(*Id.* at 8–9.)  Plaintiffs then offer examples of what they consider uncompensated off-the-clock work.  Each named plaintiff describes having to travel between client residences for 17, 18, 43, or 77 of the work weeks that occurred since late 2017.  (*Id.* at 10.)  Plaintiffs mention performing home care duties for clients beyond what would have been considered work for a regularly scheduled shift.  (*Id.* at 11.)  One other example involved the time and expense that plaintiffs incur laundering and otherwise maintaining their scrub uniforms.  (*Id.* at 12–13.)

To pursue their concerns about unpaid work, training, and expenses, plaintiffs filed the amended complaint on January 3, 2020.  The amended complaint contains 10 claims under federal and state law; plaintiffs would pursue these claims as a collective action under 29 U.S.C. § 216(b) and a class action under Rule 23.  In the first two claims, plaintiffs accuse defendants of failure to pay overtime wages under federal and state law.  In the third claim, plaintiffs accuse defendants of failure to pay a minimum wage under state law; the violation, in plaintiffs' view, comes from dividing their actual wages paid over the actual hours that they worked including off-the-clock work.  In the fourth claim, plaintiffs accuse defendants of failure to pay agreed-upon rates for their work in violation of state law.  In the fifth and sixth claims, made under state law, plaintiffs assert that defendants failed to give them required notices regarding rates of pay, allowances, regular payday designations, and other required information about compensation arrangements.  In the seventh claim, plaintiffs allege a violation of state law requiring defendants to compensate plaintiffs for maintenance of their uniforms since scrub uniforms are required.  In the eighth claim, plaintiffs accuse defendants of violations of state law pertaining to improper expenses relating to uniforms and improper deductions that cover the purchase of scrubs.  In the ninth claim, plaintiffs allege a violation of state law requiring certain additional compensation when an employer spreads a workday beyond a span

of 10 hours.  In the tenth cause of action, plaintiffs allege a violation of state law requiring certain additional compensation when the hours of the work shift are split.

The CCC Defendants filed the pending motion on January 13, 2020.  The motion contains a number of arguments in favor of dismissal, and the Court will address each argument below in more detail.  In short, the CCC Defendants argue that plaintiffs have bundled their allegations of off-the-clock work in such a way that they have failed to plead specific details about the length and frequency of any unpaid work.  According to the CCC Defendants, time spent laundering or otherwise maintaining uniforms is not compensable.  The CCC Defendants argue that plaintiffs have not stated a plausible claim about overtime wages because they have not identified "any given week when they actually worked more than 40 hours (in compensable time)."  (Dkt. No. 115 at 16.) The CCC Defendants argue further that plaintiffs have made no plausible allegations against the individual defendants and have not adequately pled successor liability against CCC for any wrongdoing by Interim.  Without any plausible federal claims under the FLSA, the CCC Defendants argue that the Court should decline to exercise supplemental jurisdiction over any state claims.

Plaintiffs oppose the motion in all respects.  In summary, plaintiffs assert that, of the hours that they work above 40 hours per week, only a portion of the extra hours is spent laundering and maintaining uniforms.  Plaintiffs, in their view, thus would be entitled to overtime pay even if time for laundering and maintaining uniforms were not compensable.  Regarding uniforms, plaintiffs argue that time related to uniforms is compensable because it is comparable to other activities that have been found compensable, such as donning a uniform before a scheduled work shift and powering up necessary machinery.  Plaintiffs argue that the individual defendants should remain in the case, at least for now, because they have plausibly alleged operational control by CCC's owner and CEO; only discovery, in plaintiffs' view, can sort out the exact details of the amount of

5

operational control.  Since plaintiffs would have the FLSA claims remain in the case, they urge the

Court to exercise supplemental jurisdiction over the various state claims.

## III.    DISCUSSION

### A.  Motions to Dismiss Generally

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability

requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short

of the line between possibility and plausibility of entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (internal quotation marks and citations omitted).  Courts assess Rule 12(b)(6)

motions "accepting all factual allegations in the complaint as true, and drawing all reasonable

inferences in the plaintiff's favor."  *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57,

61 (2d Cir. 2010) (internal quotation marks and citation omitted).  "On a motion to dismiss, the

court may consider any written instrument attached to the complaint as an exhibit or any statements

or documents incorporated in it by reference."  *Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130 (2d

Cir. 2001) (editorial and internal quotation marks and citation omitted).  "Simply stated, the question

under Rule 12(b)(6) is whether the facts supporting the claims, if established, create legally

cognizable theories of recovery."  *Cole-Hoover v. Shinseki*, No. 10-CV-669, 2011 WL 1793256, at *3

(W.D.N.Y. May 9, 2011) (internal quotation marks and citation omitted).

### B. *Laundering or Maintaining Uniforms*

The Court will address first the arguments from the CCC Defendants concerning plaintiffs'

uniforms.  Citing *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27 (2014), and other authorities, the CCC

Defendants argue that plaintiffs' efforts to launder and to maintain their uniforms are not

compensable because they are not integral and indispensable to the principal activity of patient care:

> Here, Plaintiffs claim that approximately once per week they washed and
> dried their scrubs, usually at a laundromat.  Dkt. #111, ¶ 27.  Plaintiffs claim
> generally that it took them approximately 1.5 hours to wash and dry their scrubs and
> another hour to travel to and from the laundromat.  *Id.*  Plaintiffs' claim is even more
> attenuated from the non-compensable activities analyzed in *Integrity Staffing*.  The
> activities in *Integrity Staffing* (that were determined non-compensable) were required to
> be performed: (1) at the work site, (2) at the conclusion of every shift, and (3) the
> worker was *personally* required to undergo the security screening.  In this case,
> Plaintiffs could launder their clothes whenever and wherever they chose to.
> Moreover, unlike in *Integrity Staffing*, Plaintiffs make no allegation that they were
> *personally* required to perform the laundering activities.  For example, Plaintiffs could
> have, even if they chose not to, delegated their laundering activities to a dry cleaner,
> spouse, child, or parent.  Plaintiffs' uniform laundering activities clearly are not
> integral and indispensable to the home health aides' principal activity of caring for
> patients.

(Dkt. No. 115 at 12–13; *see also* Dkt. No. 125 at 8.)  Plaintiffs do not challenge the "integral and

indispensable" standard but emphasize how applying that standard to specific jobs is fact-specific:

> The purpose of the requirement that Plaintiffs clean their scrubs is the
> protection of the health and well-being of CCC's clients and that of Plaintiffs.
> Plaintiffs' duties constantly require them to be in very close physical proximity to
> clients, regularly touching them or being touched by them.  This repeated physical
> contact results from Plaintiffs' assisting clients in *inter alia* eating, performing
> excretory functions, getting up from or lying down on a bed, couch or lounge chair,
> taking their medications and moving from one location to another.  In the course of
> performing those functions, Plaintiffs are at risk of being exposed to clients' blood,
> perspiration, infections and other bodily sores, excretory waste, etc. rubbing off on
> whatever Plaintiffs are wearing.  The scrubs Plaintiffs are required to wear must be
> cleaned regularly in order to prevent any of this matter from collecting on the scrubs
> and coming into contact with Plaintiffs' skin or being passed on to another client for
> whom a Plaintiff is caring simultaneously on another shift.  In short, the reason
> scrubs must be cleaned is to prevent the spread of infection or other contagious
> infections from a client to a Plaintiff or to another client.  Any resulting spread of
> disease, infection or illness would impair the well-being of CCC's clients and/or

> impair the well-being of Plaintiffs so that they are unavailable to care for CCC's
> clients. Either of those consequences impairs the performance of CCC's principal
> activities, all of which involve caring for the health and well-being of its clients. For
> these reasons, the cleaning of the scrubs is integral and indispensable to the
> performance of principal activities and, hence, is compensable.

(Dkt. No. 118 at 13.)

Addressing the issue of uniforms starts with the Portal-to-Portal Act, a statute that Congress passed in the early days of the FLSA; the statute effectively is an amendment of the FLSA and addressed judicial interpretations of the FLSA that Congress did not like. Under the Portal-to-Portal Act, employers do not have to pay minimum or overtime wages for "(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. § 254(a). "[T]he term 'principal activity or activities' in [Section 254(a)] embraces all activities which are an integral and indispensable part of the principal activities." *Steiner v. Mitchell*, 350 U.S. 247, 252–53 (1956) (internal quotation marks and citation omitted). "The integral and indispensable test is tied to the productive work that the employee is *employed to perform*." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 36 (2014) (citations omitted). "An activity is therefore integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Id.* at 33.

Very little case law directly addresses a scenario involving health-care uniforms. The Court, however, has found the following applications of the "integral and indispensable" test that are instructive:

8

- *Steiner*: The employees in question worked in a factory that made lead-acid batteries for automobiles. Between lead poisoning and caustic burns from sulfuric acid, the work environment was so inescapably toxic that the employers "have equipped it with shower facilities and a locker room with separate lockers for work and street clothing. Also, they furnish without charge old but clean work clothes which the employees wear. The cost of providing their own work clothing would be prohibitive for the employees, since the acid causes such rapid deterioration that the clothes sometimes last only a few days. Employees regularly change into work clothes before the beginning of the productive work period, and shower and change back at the end of that period." 350 U.S. at 251. The Supreme Court found that changing clothes at the beginning of shifts and showering at the end of them were compensable under the FLSA because "it would be difficult to conjure up an instance where changing clothes and showering are more clearly an integral and indispensable part of the principal activity of the employment than in the case of these employees." *Id.* at 256.

- *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005): The employees in question worked at a slaughterhouse producing fresh beef, pork, and related products. The employer did not challenge lower-court rulings that time spent putting on and taking off unique protective gear was compensable. The issue was whether the employees should be compensated for time spent walking between the locker rooms and the production areas. The Supreme Court said yes because the walking occurred after the protective gear was in use and before it was removed. "[D]uring a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded from the scope of [Section 254(a)], and as a result is covered by the FLSA." *Id.* at 37.

- *Integrity*: The employees in question worked at a warehouse for Amazon.com and had to undergo a security screening at the end of each day before leaving the warehouse, to deter theft. The employees wanted compensation for the time spent waiting for and then undergoing the security screenings, time that amounted to about 25 minutes each day. The Supreme Court said no. "The screenings were not an intrinsic element of retrieving products from warehouse shelves or packaging them for shipment. And Integrity Staffing could have eliminated the screenings altogether without impairing the employees' ability to complete their work." 574 U.S. at 35.

- *Musch v. Domtar Indus., Inc.*, 587 F.3d 857 (7th Cir. 2009): The employees worked at paper mills and "are regularly exposed to hazardous chemicals such as calcium oxide (a/k/a lime dust) at these paper mills. Accordingly, in order to reduce exposure to hazardous chemicals, Plaintiffs shower and change their clothing before leaving the paper mill; they are not compensated for the time these ablutions take." *Id.* at 858. The employees wanted compensation for the time spent showering and changing; the court said no. "Plaintiffs bring their work clothes home to launder them, casting doubt on the contention that these clothes are regularly exposed to hazardous chemicals. We find that recovery under the FLSA and Wisconsin state law is not appropriate: Musch has failed to demonstrate that chemical exposure is so pervasive that it requires these post-shift activities, or that Domtar has refused to compensate an employee for the time spent in these post-shift activities

9

following chemical exposure.  Further, even if there was an occasion where an employee did not discover that he had been exposed to hazardous chemicals until after changing out of his work clothes, there is nothing that would stop him from seeking compensation for the time he spent changing and showering under Domtar's current policy."  *Id.* at 860–61.

- *Bull v. United States*, 68 Fed. Cl. 212 (2005): The employees in question were federal law enforcement agents who were handlers for dogs trained to detect the scent of currency or narcotics.  The agents wanted compensation for the off-duty time spent laundering training towels and reward towels.  The court found the time compensable because the training program for the dogs stated explicitly that the towels had to be properly cleaned after each use to make the training effective.  Laundering and processing the towels thus was "integral and indispensable to the training of the dog.  If done for more than a minimal period of time, this work is compensable."  *Id.* at 239.

- *Dinkel v. MedStar Health Inc.*, 99 F. Supp. 3d 37 (D.D.C. 2015):  The employees in question were non-exempt hourly employees working at nine hospitals in the District of Columbia and in Maryland.  The hospitals had work policies regarding dress and appearance, and the employees wanted compensation for time spent maintaining their uniforms.  The court said no.  "Plaintiffs argue that their uniform maintenance activities were important to the hospital's infection control policy, but they do not argue and they cannot show that their jobs would be so unsafe as to be effectively impossible to carry out their jobs without their uniform maintenance activities.  For the battery-plant employees [in the *Steiner* case], they themselves had to shower and change immediately at their workplace upon completing their other work.  By contrast, the parties do not dispute that Plaintiffs conduct their uniform maintenance activities in a wide variety of ways—from the employees completing all cleaning activities themselves to sharing uniform maintenance responsibilities with family members to taking certain items to professional cleaners.  Minimizing infection—even accepting Plaintiffs' experts' testimony regarding the importance of infection control—does not reach the level of importance to Plaintiffs' principal activities as the showering and changing of the battery-plant employees."  *Id.* at 42–43.

- *Whaley v. Henry Ford Health Sys.*, 172 F. Supp. 3d 994 (E.D. Mich. 2016): The employee in question was an MRI technologist at a hospital.  The employee wanted compensation for time spent laundering and maintaining a uniform.  The hospital had a policy in place requiring a "well-groomed" appearance; the employee argued that he had potential contact with pathogens; and the hospital had no laundry or ironing facilities on site.  The court found that the time was not compensable.  "The plaintiff has not described a need or obligation to create a sterile atmosphere—as in an operating room—or to don protective clothes and shed contaminated gear in the workplace—as in *Steiner v. Mitchell*—or to prepare tools that are essential to the performance of his assigned tasks—as in *Mitchell v. King Packing Co.* [350 U.S. 260 (1956)]."  *Id.* at 1004.  The Court further contrasted the plaintiff's situation with the situation in *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706 (2d Cir. 2001), where time spent powering up and testing an X-ray machine was integral to the job of an X-ray technician.

From the above cases, and others that the parties have cited in their papers, some patterns emerge. The above cases all featured fairly well-developed records examined at the appellate level, after a bench trial, or after motions for summary judgment. As in *Alvarez*, activities that occur after the start and before the end of principal activities will be compensable. *Integrity* suggests that compensation is not required under the FLSA for activities that are not an intrinsic element of why the employees are there in the first place, even if refusal to engage in those activities would get the employees fired. *Bull* indicates that activities can be compensable if training materials state explicitly that the object of the training cannot be accomplished without those activities. In contrast to the relative clarity of those cases, *Steiner*, *Musch*, *Dinkel*, and *Whaley* have more penumbral implications. Those cases can be viewed at one layer as holding consistently with other cases that uniforms, by themselves, are not the final good or service that the employees are paid to deliver. Yet a second layer—danger to the employees or to others—sits on top of the first. In the second layer, the cases can be arranged in order of ascending danger. In *Whaley*, the principle that uniform maintenance is not compensable did not yield to aesthetic concerns about employee appearance or to indirect health exposures in a hospital. In *Musch* and *Dinkel*, the courts seem to have recognized some concern about chemical exposure and infection control, but the concerns were not given great weight because the employees appear to have felt comfortable bringing their contaminated uniforms home. A comfort level with bringing uniforms home appears to be what changed the result in *Steiner*. Theoretically, maintenance of uniforms in *Steiner* was no more integral to the final product of those employees than the maintenance and other cases. What changed was the hazard: The employees in *Steiner* likely would have revolted had their employer ignored obvious ethical concerns and tried to force employees to bring home uniforms poisoned with lead and highly caustic acid.

11

In the above context, and at this very early stage of the litigation, prudence warrants further development of the record before determining how this case compares to the explicit holdings and the implicit principles of all of the above cases.  Right now, the Court has only the amended complaint to examine.  The amended complaint adequately puts the CCC Defendants on notice that, *inter alia*, plaintiffs have concerns about how much off-the-clock work they invest in maintaining uniforms that have to stay clean because those uniforms enter the intimate, personal residences of clients who might be elderly, infirm, immune-compromised, or all of the above.  The Court hopefully does not have to emphasize, during an ongoing global pandemic that is being neutralized *by social isolation at home*, the importance of keeping infections out of the homes of the old and the sick.  Beyond the notice to the CCC Defendants, numerous factual questions remain.  The record currently does not contain copies of any employment contracts, whose language might define uniform maintenance as integral to the job.  The record contains little if any information about the training that plaintiffs undergo; training information that explicitly discusses uniform maintenance might put this case closer to the situation in *Bull*.  Plaintiffs also have a lot to do in discovery to elaborate on exactly what they do for their clients; how much contamination their uniforms might suffer from how much direct personal contact; and why they would feel comfortable bringing contaminated uniforms home, or to and from a public laundromat, simply because they were paid to do so.  For Rule 12 purposes, none of these questions can be answered so categorically, as a matter of law, that factual development would be unnecessary.  The Court thus finds persuasive the approach from one of the cases that plaintiffs have cited: "Whether these uniforms are truly integral to these ends will ultimately dictate whether preliminary or postliminary time spent maintaining these uniforms is compensable.  This is a very difficult determination on these limited averments.  Therefore, while ultimately a question of law, further factual development is warranted before it can

12

be determined whether these uniforms are truly indispensable to nursing." *Attanasio v. Cmty. Health Sys., Inc.*, 863 F. Supp. 2d 417, 429 (M.D. Pa. 2012) (citations omitted). Accordingly, the Court recommends denying the CCC Defendants' motion with respect to issues of uniform laundering and maintenance.

### C.  Overtime Compensation and Specificity

Next, the Court will review the CCC Defendants' arguments about overtime compensation. Simply put, the CCC Defendants argue that plaintiffs have failed the Rule 8 standard by failing to itemize specific weeks in which they worked over 40 hours and specific types of work that push them over that threshold. The argument hints at other arguments about compensable time because of why the CCC Defendants want the itemization. The CCC Defendants want itemization because they believe that any supposed overtime hours, upon further scrutiny, would turn out to be hours spent on non-compensable activity:

> Simply alleging that Plaintiffs worked some amount greater than forty hours per week, without identifying any given week when they actually worked more than 40 hours (in compensable time), is insufficient to state a plausible overtime claim. *Dejesus*, 726 F.3d at 90 (finding that a plaintiff cannot state a plausible overtime claim by "alleging overtime in 'some or all workweeks'"); *Bonn-Wittingham*, 2019 U.S. App. LEXIS 35110, at *6 (the court "was under no obligation to accept as true [plaintiffs'] statement, amounting to a bare legal conclusion, that they worked in excess of forty hours."); *Smith v. Mastercraft Decorators, Inc.*, 09 Civ. 579, 2011 U.S. Dist. LEXIS 125342, at *6-7 (W.D.N.Y. Oct. 25, 2011) (allegation that plaintiff "routinely" worked over 40 hours insufficient); *Serrano v. I. Hardware Distribs., Inc.*, 2015 U.S. Dist. LEXIS 97876, at *7-8 (S.D.N.Y. July 27, 2015) (allegations that plaintiffs "worked 'an average' of 62 and 60 hours per week" and "'often' worked over ten hours per day" without receiving overtime "over a period of years" failed to state an overtime claim because plaintiffs did "not allege that they worked more than 40 hours in a 'given' work week"). Since Plaintiffs do not "provide sufficient detail about the length and frequency of [their] unpaid work to support a reasonable inference that [they] worked more than forty hours in a given week," their FLSA overtime claim must be dismissed. *Nakahata*, 723 F.3d at 201.

> Though Plaintiffs have alleged certain *categories* of allegedly compensable time for which they were not paid, Plaintiffs have provided no factual allegations showing they worked over 40 hours of *compensable* time in any workweek. Plaintiffs'

allegations are the same conclusory statements that the Second Circuit has repeatedly dismissed as being insufficient. *See Bonn-Wittingham*, 2019 U.S. App. LEXIS 35110, at *6 ("the district court was under no obligation to accept as true [plaintiffs'] statement, amounting to a bare legal conclusion, that they worked in excess of forty hours."). In case after case, the Second Circuit has determined that simply alleging that one worked over 40 hours and that there was some uncompensated time is insufficient to plead an FLSA overtime claim. *Id.*; *Lundy*, 711 F.3d at 115; *Marte v. Westbury Mini Mart, Inc.*, No. 16-cv-53 (SJF) (ARL), 2017 U.S. Dist. LEXIS 7721, at *7-8 (E.D.N.Y. Jan. 18, 2017) ("Plaintiffs' blanket allegations of working sixty hours over six straight days, with no detail as to the hours, days or weeks worked, are insufficient to state a claim for failure to pay overtime 'in a given workweek.'").

(Dkt. No. 115 at 16–17.) Plaintiffs counter that the amended complaint contains enough detail to put the CCC Defendants on notice of unpaid overtime work even if laundering and maintenance of their uniforms were considered non-compensable:

> The Amended Complaint includes the following facts: Oretha Beh, Briana Kincannon and Kimberley Balkum were each employed by CCC Defendants beginning in October, 2017 and continuing through the present, except for Balkum, who was employed through January, 2019. Their hours worked on-the-clock were scheduled by Defendants and compensated at their respective regular rates of pay. Their hours worked off-the-clock were unscheduled and were not compensated at all. *See* Am. Compl., para. 19. From approximately October, 2017 until a few months before the filing of this action on October 22, 2019, Beh worked approximately 35 hours per week on-the-clock and approximately 9 hours per week off-the-clock. In short, during that period, Beh worked approximately 44 hours per week and was not compensated at 1.5 times her regular rate of pay for the time she worked in excess of 40 hours. For several months until approximately December 7, 2019, Briana Kincannon worked at least 35 hours per week on-the-clock and 7 to 9 hours per week off-the-clock. Thus during that period of time, Kincannon worked at least 42 to 44 hours per week and was not compensated at 1.5 times her regular rate of pay for the time in each week she worked in excess of 40 hours. From October, 2017 through October, 2018, Kimberley Balkum worked approximately 40 hours per week on-the-clock and approximately 9 hours per week off-the-clock. In short, during that period, Balkum worked approximately 49 hours per week and was not compensated at 1.5 times her regular rate of pay for the time she worked per week in excess of 40 hours. (Am. Compl., paras. 11, 12, 14, 46-48).

> Defendants argue that a part of the off-the-clock hours worked each week by Beh, by Kincannon and by Balkum consisted of time expended on the cleaning of the scrubs the Plaintiffs were required to wear while providing home care and, thus, Plaintiffs have not shown they worked in excess of 40 hours per week, not counting the time expended on their cleaning of scrubs. This contention is dependent upon an assumption that each of them worked a certain number of hours per week

specifically on cleaning their scrubs: in Beh's case, Defendants' assumption is that cleaning her scrubs occupied at least 4 hours each week; in Kincannon's case, their assumption is that cleaning her scrubs took up at least 2 to 4 hours per week; and in Balkum's case, Defendants assume that she spent at least 9 hours each week cleaning her scrubs.

(Dkt. No. 118 at 8–10.)

"[T]o state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours. Determining whether a plausible claim has been pled is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013) (internal quotation marks and citations omitted). Overtime claims will fail when plaintiffs allege that they "typically" or "occasionally" work certain hours; or that they spend time on events "such as" unspecified meetings; or that they work certain amounts of time "on average." *Id.* at 114–15. Overtime claims will fail also when plaintiffs allege generically that they "regularly worked hours both under and in excess of forty per week and were not paid for all of those hours," *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 199 (2d Cir. 2013), especially where they failed to allege that they "were scheduled to work forty hours in a given week," *id.* at 201. Merely tracking the language of the FLSA will not work, either. *See Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 89 (2d Cir. 2013) ("[Plaintiff Dejesus] did not estimate her hours in any or all weeks or provide any other factual context or content. Indeed, her complaint was devoid of any numbers to consider beyond those plucked from the statute. She alleged only that in 'some or all weeks' she worked more than 'forty hours' a week without being paid '1.5' times her rate of compensation, no more than rephrasing the FLSA's formulation specifically set forth in section 207(a)(1). Whatever the precise level of specificity that was required of the complaint, Dejesus at least was required to do more than repeat the language of the statute.").

Here, even if more detail would have been helpful, plaintiffs have offered sufficient specificity about alleged overtime hours.  The amended complaint contains some of the language about variations in hours and about "average number of hours" (Dkt. No. 111 at 24) that the Second Circuit found problematic in *Lundy*.  Nonetheless, plaintiffs also offered more specifics:

> On information and belief: (a) until a few months before the filing of this action, Plaintiff Beh worked approximately thirty-five hours per week on the clock plus approximately nine compensable hours per week off the clock, for a weekly total of forty-four hours; (b) for several months until approximately December 7, 2019, Plaintiff Kincannon worked at least thirty-five hours per week on the clock and seven to nine hours per week off-the-clock, for a weekly total of at least forty-two hours; and (c) through October 2018, Plaintiff Balkum worked approximately forty hours per week on the clock and approximately nine compensable hours per week off the clock, for a weekly total of forty-nine hours.  The off-the-clock work included travel between client residences, washing and drying of scrubs and, four times per year, mandatory home care training activities.

(*Id.* at 24–25.)  Considering that the claims about laundering and maintenance of uniforms will remain in the case for now, plaintiffs have set forth a plausible scenario of a specific number of hours per week with a specific date range.  *See Lundy*, 711 F.3d at 114 n.7 ("Under a case-specific approach, some courts may find that an approximation of overtime hours worked may help draw a plaintiff's claim closer to plausibility.").  Plaintiffs have done more than allege that they worked "beyond 40 hours per week."  *Cf. Zhong v. Aug. Aug. Corp.*, 498 F. Supp. 2d 625, 630 (S.D.N.Y. 2007) ("As discussed above, Zhong has merely alleged that he worked 'beyond 40 hours per week.' (Compl.¶ 4).  For these reasons, the Court finds that Zhong has not properly pled facts to support his claim for overtime compensation."); *see also Bonn-Wittingham v. Project OHR, Inc.*, 792 F. App'x 71, 75 (2d Cir. 2019) (summary order) ("Contrary to Plaintiffs-Appellants' argument, the district court was under no obligation to accept as true their statement, amounting to a bare legal conclusion, that they worked in excess of forty hours; moreover, absent any supporting factual detail, there were no plausible inferences to be drawn in their favor."); *Leon v. Port Washington Union Free Sch. Dist.*, 49 F.

Supp. 3d 353, 357–58 (E.D.N.Y. 2014) ("Plaintiff alleges that she regularly worked forty hours per

week, and provided sufficient estimates of how much additional time she worked each week—

namely 1 ½ to 2 hours per week. She further estimated that she took her bona fide meal period 1 in

20 days during the school year, and consistently during the summer months when school was not in

session. Like the other courts in this Circuit outlined above denying motions to dismiss, the Court

finds that these allegations sufficiently state that Plaintiff regularly worked forty hours a week and

sufficiently describe the pattern of her overtime, but uncompensated work."). More precise

determinations of unpaid overtime hours can await discovery.[2] The cases that the CCC Defendants

cited are distinguishable for the lack of an exact number of hours worked per week over a specific

date range. *See, e.g., Serrano v. I. Hardware Distributors, Inc.*, No. 14-CV-2488 PAC, 2015 WL 4528170,

at *4 (S.D.N.Y. July 27, 2015) ("Plaintiff Serrano alleges that he worked an average of 62 hours per

week over period of 14 years; Plaintiff Diaz asserts that he worked an average of 60 hours per week

during his 9–year employment."). Accordingly, the Court recommends denying the CCC

Defendants' motion with respect to issues of overtime compensation.

### D. Claims Against Individual Defendants

The Court now will turn to the CCC Defendants' arguments that defendants Caro and

Gatien should not face individual liability. As the Court noted above, Caro is the owner of CCC,

---

[2] Plaintiffs have cited to a declaration elsewhere in the record that would provide additional details about time spent in excess of 40 hours per week. (Dkt. No. 118 at 10.) For Rule 12 purposes, the Court is disregarding the declaration as extrinsic evidence that is not integral to the complaint itself. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 558–59 (2d Cir. 2016) ("A motion brought under Rule 12(b)(6) challenges only the legal feasibility of a complaint. The test of a claim's substantive merits is reserved for the summary judgment procedure, governed by Federal Rule of Civil Procedure 56, where both parties may conduct appropriate discovery and submit the additional supporting material contemplated by that rule." (internal quotation and editorial marks and citations omitted).)

and Gatien is the CEO.  According to the CCC Defendants, plaintiffs have included no details in

their amended complaint showing that Caro or Gatien exercised the kind of control that would

make them "employers" for purposes of the FLSA:

> Notably, Plaintiffs do not allege that they ever spoke with or had any direct interaction with Mr. Gatien or Mr. Caro or that the individual defendants actually set any of Plaintiffs' terms and conditions of employment.  *See Sampson*, 2012 U.S. Dist. LEXIS 103052, at \*12-14; *Wolman v. Catholic Health Sys. of Long Island*, 2011 U.S. Dist. LEXIS 48223, at \*3 (E.D.N.Y. May 5, 2011).  If Mr. Gatien or Mr. Caro hired or fired Plaintiffs, supervised or scheduled Plaintiffs, determined Plaintiffs' rate of pay, or maintained the employment records for Plaintiffs, Plaintiffs should so claim in the Complaint – but they do not.  They have simply added high level executives as party defendants, and glossed over the need to assert specific factual allegations by merely regurgitating the applicable legal test.  *See, e.g., Lian Lin*, 2009 U.S. Dist. LEXIS 29779, at \*7 (dismissing complaint that "does not allege any facts regarding the positions held by the Individual Defendants or their power to control plaintiffs' hours, wages, or other terms and conditions of employment"); *Bravo v. Eastpoint Int'l, Inc.*, No. 99 Civ. 9474 (WK), 2001 U.S. Dist. LEXIS 3647, at \*4-5 (S.D.N.Y. Mar. 30, 2001) (dismissing FLSA claim against fashion designer Donna Karan as employer because plaintiffs only alleged her status as the owner and chairperson of employer company and failed to allege any facts establishing her "power to control the plaintiff workers").

> In the Amended Complaint, Plaintiffs have asserted only conclusory allegations against Mr. Gatien and Mr. Caro that do not correct the insufficiencies in the original Complaint. Plaintiffs simply regurgitate language from 29 U.S.C. § 203(g), alleging that Mr. Gatien and Mr. Caro "suffered and permitted" each of the alleged violations of the FLSA. Dkt. #111, ¶ 32.  These legal conclusions do nothing to bolster Plaintiffs' insufficient claims.  Plaintiffs still fail to assert a single allegation that Mr. Gatien and Mr. Caro had operational control over Plaintiffs' employment.

(Dkt. No. 115 at 19–20.)  Plaintiffs counter by citing the portions of the amended complaint in

which they allege that Caro and Gatien had operational control of the company and controlled

various policies and practices.  (Dkt. No. 118 at 18.)  Plaintiffs assert further that they accused Caro

and Gatien of knowing about improper policies and practices but doing nothing about them.  (*Id.* at

19.)

"Because the [FLSA] defines employer in such broad terms, it offers little guidance on

whether a given individual is or is not an employer.  In answering that question, the overarching

18

concern is whether the alleged employer possessed the power to control the workers in question with an eye to the 'economic reality' presented by the facts of each case.  Under the 'economic reality' test, the relevant factors include whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (internal quotation marks and citations omitted).  "No one of the four factors standing alone is dispositive.  Instead, the 'economic reality' test encompasses the totality of circumstances, no one of which is exclusive.  Since economic reality is determined based upon all the circumstances, any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition.  Yet, such status does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees.  Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control do not diminish the significance of its existence."  *Id.* (internal quotation and editorial marks and citations omitted).  "In our view, the broad language of the FLSA, as interpreted by the Supreme Court in [*Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947)], demands that a district court look beyond an entity's formal right to control the physical performance of another's work before declaring that the entity is not an employer under the FLSA.  Moreover, as explained below, neither [*Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984)] nor *Herman* supports the application of a rigid four-part test in the instant case.  In those cases, we held only that the four factors applied by the District Court in this case can be sufficient to establish employer status.  We did not hold, nor under *Rutherford* could we have held, that a positive finding on those four factors is necessary to establish an employment relationship."  *Zheng v. Liberty Apparel*

*Co. Inc.*, 355 F.3d 61, 69 (2d Cir. 2003). "Most circuits to confront this issue [of operational control] have acknowledged . . . that a company owner, president, or stockholder must have at least some degree of involvement in the way the company interacts with employees to be a FLSA 'employer.'" *Irizarry v. Catsimatidis*, 722 F.3d 99, 107 (2d Cir. 2013).

Here, plaintiffs have the better argument at this early stage, subject to further consideration after discovery. Plaintiffs have pled that Caro "has been the owner of CCC and has had operational control of said company. He has and has had substantial control over the wages, hours and working conditions as well as the hiring and discharge of individuals employed by CCC, including those employed as PCAs or HHAs." (Dkt. No. 111 at 4.) Plaintiffs have pled that Gatien "has been the Chief Executive Officer of CCC and has had operational control of said company. He has and has had substantial control over the wages, hours and working conditions as well as the hiring and discharge of individuals employed by CCC, including those employed as PCAs/HHAs." (*Id.* at 4–5.) *Cf. Sampson v. MediSys Health Network, Inc.*, No. 10-CV-1342 SJF ARL, 2012 WL 3027838, at *5 (E.D.N.Y. July 24, 2012) (dismissal required where "plaintiffs do not allege that these individuals [company CEO and a vice president] had 'operational control' over the employees"). The named plaintiffs each allege that they were employed by Caro and Gatien—mentioned by name with the first plaintiff and then labeled collectively as the "CCC Defendants"—during their times of employment. (*Id.* at 6.) The numerous factual paragraphs that follow contain many allegations of what the "CCC Defendants"—a term that, again, was defined to include Caro and Gatien—required from plaintiffs during their employment. For example, plaintiffs have alleged that the CCC Defendants knew about their off-the-clock work and required it for their financial benefit. (*See id.* at 8.) As just another example, plaintiffs have alleged that the CCC Defendants required them to wear uniforms but expected them to take care of the uniforms on their own; and that the CCC

Defendants required plaintiffs to travel between client homes without compensation for time or mileage. (*See id.* at 9–10.) With all of the allegedly improper policies in place, plaintiffs have alleged that Caro and Gatien knew about the policies, heard complaints about them, and yet made no changes "despite having the power and authority to do so." (*Id.* at 14.) If plaintiffs had direct contact with Caro and Gatien about the allegedly improper policies then some kind of direct quotation or summary of Caro's and Gatien's responses would have made the Court's analysis less of a close call than it has turned out to be. *Cf. MacIntyre v. Moore*, 267 F. Supp. 3d 480, 484 (W.D.N.Y. 2017) (putting aside unresolved issue of whether a public-sector official can be held individually liable, dismissal required where "[t]here are no allegations that [defendant] supervised or controlled [plaintiffs'] work schedules or conditions of employment, determined their pay, or maintained any employment records"). Nonetheless, evidence is not required at this stage, and the Court is mindful that the major opinions cited by the parties issued after summary-judgment motions or bench trials. For Rule 12 purposes, plaintiffs have done enough to set forth a plausible scenario in which the owner and the CEO of a company delivering home care services would be more than silent partners and would have some influence over how the company presented itself to clients (*e.g.*, uniforms, services, and hours) and who would help with that presentation (*e.g.*, hiring, firing). *Cf. Jindan Wu v. Nat. Tofu Rest. Corp.*, No. 16-CV-3613-ARR-ST, 2018 WL 1009274, at *11 (E.D.N.Y. Feb. 20, 2018) (51% owner of a restaurant found to be an "employer" where he "supervised and controlled the conditions of employment, maintained employment records, and had the power to hire and fire employees"); *Hinckley v. Seagate Hosp. Grp.*, LLC, No. 16-CV-6118 CJS, 2016 WL 6524314, at *11 (W.D.N.Y. Nov. 3, 2016) (motion to dismiss denied where amended complaint pled that company CEO "is primarily responsible for implementing business decisions as they pertain to the Inn, including but not limited to decisions concerning company labor guidelines,

budgets, and other financial controls"); *Inclan v. New York Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 509 (S.D.N.Y. 2015) (summary judgment for plaintiffs on individual liability, where sole owner of a restaurant signed the lease and held weekly meetings with the management team about wage and hour issues); *Hart v. Crab Addison, Inc.*, No. 13-CV-6458 CJS, 2014 WL 2865899, at *12 (W.D.N.Y. June 24, 2014) (motion to dismiss denied where complaint pled that company CEO had hiring and firing authority and influenced marketing and HR operations).  Accordingly, the Court recommends denying the CCC Defendants' motion with respect to issues of individual liability under either federal or state law.[3]

### E.  Supplemental Jurisdiction and State Claims

No significant analysis is needed here.  The CCC Defendants' argument for declining supplemental jurisdiction rests entirely on the premise that all federal claims would be dismissed.  If Judge Sinatra agrees that the federal claims should remain in place through discovery then supplemental jurisdiction over the state claims should be maintained.  *See* 28 U.S.C. § 1367(a); *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234 (2d Cir. 2011).

### F.  Successor Liability

No significant analysis is needed here, either.  All 10 claims in the amended complaint refer separately to the "CCC Defendants and Interim Defendants."  The CCC Defendants might have inferred that plaintiffs were pursuing successor liability from their mention of the October 13, 2017 sale of some home care businesses by Interim to CCC.  (Dkt. No. 111 at 7.)  Nonetheless, plaintiffs listed Interim and CCC separately in the amended complaint, and plaintiffs have pled that Interim is an ongoing, separate business.  (*Id.* at 5.)  The Court does not know, as of this writing, why Interim

---

[3] In a footnote in their motion papers, defendants clarified that their arguments about individual liability under the FLSA applied equally to any state claims that plaintiffs had against Caro and Gatien.  (Dkt. No. 115 at 17 n.3.)

has not yet appeared in the case.  In any event, plaintiffs have clarified that "no claim of successor

liability was or has been made in this action."  (Dkt. No. 118 at 6 n.2.)  If the need arises later to

consider successor liability then plaintiffs can make an appropriate motion under Rule 15.

Under the circumstances, the Court recommends that this portion of the CCC Defendants'

motion be denied as moot, without prejudice to renew later should plaintiffs seek to amend their

complaint to include a theory of successor liability.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends denying the pending

motion to dismiss (Dkt. No. 114).

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by

electronic filing on the date below.  "Within 14 days after being served with a copy of the

recommended disposition, a party may serve and file specific written objections to the proposed

findings and recommendations."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Any

objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate

judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir.

2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002)

("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's

report and recommendation operates as a waiver of further judicial review of the magistrate's

decision.") (citation omitted).  "We have adopted the rule that failure to object timely to a magistrate

judge's report may operate as a waiver of any further judicial review of the decision, as long as the

parties receive clear notice of the consequences of their failure to object.  The rule is

enforced under our supervisory powers and is a nonjurisdictional waiver provision whose violation we may excuse in the interest of justice." *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997) (internal quotation marks and citations omitted).

"Where a party only raises general objections, a district court need only satisfy itself there is no clear error on the face of the record.  Indeed, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review.  Such objections would reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 312–13 (S.D.N.Y. 2009) (internal quotation and editorial marks and citations omitted); *see also Paterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role reduced to that of a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round.  In addition, it would be fundamentally unfair to permit a litigant to set its case in motion before the magistrate, wait to see which way the wind was blowing, and—having received an unfavorable recommendation—shift gears before the district judge.") (citation omitted).

SO ORDERED.

___/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: April 20, 2020